FILED - MQ
July 18, 2011 11:43 AM
TRACEY CORDES, CLERK
U.S. DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
BY: mlc/ Scanned by 7/18

# UNITED STATES DISTRICT COURT
## FOR THE
## WESTERN DISTRICT OF MICHIGAN

**1:11-cv-735**
Janet T. Neff, US District Judge

| | |
|---|---|
| BARBARA L BECK<br>an individual<br>in Pro Se<br>2218 N Rapids Rd<br>Manitowoc, WI 54220 | CASE NO:<br><br>HON |
| | : |
| Plaintiff | |
| v. | **COMPLAINT** |
| THE CITY OF PLAINWELL, MICHIGAN<br>a municipal corporation<br>141 N Main Street<br>Plainwell, MI 49080 | |
| AND | |
| ERIK J. WILSON<br>Individually and in his official capacity<br>as city manager, City of Plainwell<br>141 N Main Street<br>Plainwell, MI 49080 | JURY TRIAL<br>DEMANDED |
| WILLIAM BOMAR<br>Individually and in his official capacity<br>as director of public safety, City of Plainwell<br>141 N Main Street<br>Plainwell, MI 49080 | |
| ROBERT A. CHAMPION<br>Individually and in his official capacity<br>as city attorney, City of Plainwell<br>124 E. Bridge Street<br>Plainwell, MI 49080 | |
| JOHN VARLEY<br>Individually and in his official capacity<br>as Sgt/detective, City of Plainwell<br>141 N Main Street<br>Plainwell, MI 49080 | |

RICKY L. UPDIKE
Individually and in his official capacity
as superintendent of public works, City of Plainwell
126 Fairlane Street
Plainwell, MI 49080

R. DAVID DEHART
Individually and in his official capacity
as co-conspirator, City of Plainwell
118 W Plainwell Street
Plainwell, MI 49080

BARBARA L. REED
Individually and in her official capacity
as co-conspirator, City of Plainwell
508 S Main Street
Plainwell, MI 49080

       Defendants

_____/

## COMPLAINT

COMES NOW the plaintiff BARBARA L. BECK, in Pro Se, and for her Civil

Rights Complaint, states as follows:

## PRELIMINARY STATEMENT

1.     This is a civil rights action brought in Pro Se by Barbara L. Beck in which she

seeks relief for the defendants' violation of her rights, privileges and immunities protected

and/or secured by the first, fifth and fourteenth amendments to the United States Constitution,

and of rights secured under the laws and Constitution of the State of Michigan. Ms. Beck

seeks damages, both compensatory and punitive, affirmative and equitable relief, an award of

costs, interest and attorney's fees, if at any time applicable, and other and further relief as this

Court deems just and equitable.

2.     Ms. Beck complains defendants, the City of Plainwell and the officers and

officials of the City of Plainwell, individually and in their official capacity, knowingly and intentionally colluded to engage in a pattern and practice of conduct they knew or should have known would create an unreasonable risk of depriving and/or violating or both, Ms. Beck's federally protected rights, privileges and immunities secured by the laws and Constitutions of the United States and the state of Michigan, in violation of 42 U.S.C. §1983 and §1985(3).

3. Ms. Beck complains defendants, although acutely aware these risks existed, were deliberately indifferent to these risks which then resulted in severe injuries to Ms. Beck.

4. Ms. Beck complains defendants' actions were unlawful; a malicious, retaliatory and oppressive conspiracy meant solely to intimidate, silence and retaliate against Ms. Beck for her attempts to redress her grievances with the officers and officials of the City of Plainwell.

5. Ms. Beck complains defendant Wilson was liable for defendants' Bomar's, Updike's and Champion's conduct. Defendant Bomar was responsible for defendant Varley's conduct. Defendants were responsible for defendants' Dehart's and Reed's conduct.

6. Ms. Beck complains defendants colluded and conspired to deprive Ms. Beck of her federally protected rights by using and/or misusing their power and authority as public employees possessed by virtue of state law and made possible only because the defendants were clothed with the authority of state law.

7. Ms. Beck complains as a result of defendants conduct, Ms. Beck suffered severe and irreparable injuries including but not limited to being unlawfully restrained for 21 months, denied her rights under the First, Fifth and Fourteenth Amendments, including her reasonable expectation of equal protection, severe emotional and psychological injury, and unlawful seizure of her property.

8.    Ms. Beck complains defendants knowingly and unlawfully engaged in a conspiracy and ex-parte communications with the court persuading the court authorize and/or enforce or both a discriminatory pattern and practice of conduct against Ms. Beck while deliberately demonstrating blatant indifference to the facts, the unambiguous language in the constitutions of the United States and the state of Michigan, Michigan statutes, court rules and rule of law,

9.    Ms. Beck complains defendants' worked the trial court to ensure the court would support defendants false accusations, ignoring defendants false sworn statements in Affidavits and Petitions, false arguments and false testimony solely to the detriment of the Ms. Beck.

## JURISDICTION AND VENUE

10.    This Court has federal question jurisdiction over this action pursuant to 28 USC §1331 being an action seeking redress for the violation of Ms. Beck's constitutional and civil rights.

11.    Jurisdiction is also invoked herein pursuant to the first, fifth and fourteenth amendments to the United States Constitution and 42 U.S.C. §1983 and 42 U.S.C. §1985(3).

12.    Venue is proper in this district pursuant to 28 USC §1391(b).

13.    This Court has supplemental jurisdiction over the state law claims pursuant to 28 USC §1367.

## JURY TRIAL DEMANDED

14.    Ms. Beck demands a trial by jury on each of the causes of action pleaded herein.

## PARTIES

15.    Plaintiff BARBARA BECK is a private citizen of the City of Manitowoc, County of Manitowoc, State of Wisconsin and has resided in Manitowoc since March 17, 2009. Prior

to relocating to Wisconsin, Ms. Beck was a resident of Oshtemo Township, County of Kalamazoo, State of Michigan. As a result of defendants' ongoing unlawful, intentional, conspiracy and malicious conduct, Ms. Beck is indigent and, as a result, is in Pro Se.

16.     Defendant CITY OF PLAINWELL, is a municipal corporation which maintains its governmental and department of public safety offices in the CITY OF PLAINWELL, County of Allegan. State of Michigan.

17.     The CITY OF PLAINWELL is at all times responsible for its policies, procedures, and practices implemented through its departments, agents and employees, and for injury occasioned thereby, at all times relevant to this Complaint.

18.     The CITY OF PLAINWELL is the employer of defendants ERIK WILSON as its city manager, WILLIAM BOMAR as its director of public safety and chief of police, ROBERT CHAMPION as its city attorney, RICKY UPDIKE as its superintendent of public works, and JOHN VARLEY as its sergeant/detective, at all times relevant to this Complaint.

19.     Defendants' WILSON, BOMAR, VARLEY, UPDIKE and CHAMPION at all times were vested with the authority to act under the color of state law in exercising their duties and responsibilities as proscribed by their respective positions in the CITY OF PLAINWELL, at all times relevant to this complaint.

20.     Defendants' R. DAVID DEHART and BARBARA L. REED are private citizens of Plainwell, Michigan who willfully and knowingly conspired with defendants' intent to deprive MS. BECK her rights and retaliate against her for exercising her federally protected rights. The parties are state actors, [1] [2] at all times relevant to this Complaint.

---

[1] Dennis v. Sparks, 449 U.S. 24, 28 (1980) (holding that private parties who corruptly conspired with a state judge acted "under color of law").

[2] Adickes v. Kress & Co., 398 U.S. 144, 152 (1970) (stating that action is "under color" if person is a "willful participant in joint activity with the State or its agents").

21. Defendants BOMAR, VARLEY AND UPDIKE are members of defendant Wilson's executive leadership team, at all times relevant to this Complaint.

22. In his role as the CITY OF PLAINWELL city attorney, defendant CHAMPION has far-reaching access to privileged information and works directly with defendants' WILSON, BOMAR, VARLEY and UPDIKE, at all times relevant to this Complaint.

23. Defendant CHAMPION is an officer of the court and is required to abide by the Michigan Rules of Professional Conduct, at all time relevant to this Complaint.

24. Defendant CHAMPION has a personal relationship with Judge Curtis J. Bell and his spouse, Cheri Bell, at all times relevant to this Complaint.

## COMMON ALLEGATIONS

25. The facts are being pled with particularity to Federal Rule 26.

26. Ms. Beck restates and realleges as though fully set forth herein paragraphs 1-24 of this Complaint.

27. On July 18, 2008 around 11:45 pm, defendant Updike contacted his colleague defendant Varley, a detective at Plainwell Public Safety, hereafter PPS, and filed a complaint against Ms. Beck falsely alleging his neighbor, defendant Dehart, had caught Ms. Beck stalking defendant Updike's home in Plainwell earlier that evening.

28. Updike reported Dehart stopped him as he and defendant Reed were returning home on July 18, 2008 to inform him Dehart caught a woman stalking Updike's home in Plainwell.

29. Varley documented in Plainwell Public Safety - Complaint Incident Report, hereafter CIR, #08-001996 "Rick advised that he had just arrived home approximately five minutes ago when he was approached by his neighbor David Denhart (sic) [Dehart] who lives

on the 100 block of Plainwell Street. David told him that a woman was on his [Updike's] property on the south side looking in the windows very close to his residence. David described the woman and the woman's description fit his ex-wife's, [Ms. Beck] description, exactly."

30.     On July 19, 2008 Varley left two voicemails on Ms. Beck's cell phone requesting she contact him. Varley did not attempt to reach Ms. Beck at her home phone number; a number which was listed on defendants' employee directory and was in the phone book. Updike knew Ms. Beck seldom used her cell phone. He told Varley he could not recall his former home phone number.

31.     Five days later, Updike was able to recall his former home phone number; he used it on his false sworn Petition requesting the court grant him an ex-parte PPO against Ms. Beck.

32.     On Sunday, July 20, 2008 at approximately 4:00 pm, Ms. Beck retrieved her cell phone messages and was made aware of Updike's false allegations. Varley's message stated Ms. Beck was the sole suspect under investigation for running though Updike's neighbors' yards and talking with his neighbors. Ms. Beck immediately contacted PPS. She was told Varley was not working; she should call back on Monday, July 21, 2008 after 1:30 pm.

33.     On July 21, 2008 at exactly 1:35 pm, Ms. Beck returned Varley's call; Varley chose to interview Ms. Beck via telephone. Ms. Beck informed Varley she was not in Plainwell on July 18 2008; she was at home in bed in Kalamazoo and had an overnight guest who could corroborate this fact. She also asked him why he didn't try her home phone number, stating, "Had you tried me at home, you would have known I was not in Plainwell." He replied Updike couldn't remember his former home phone number.

34.     Ms. Beck called Varley back around 2:20 pm and asked if he found it odd Updike

35.    couldn't recall his former number, his phone number for over seven years. Varley said it was unusual. Their conversation was not documented in CIR #08-001996.

36.    At approximately 4:30 pm on July 21, 2008 Varley contacted Ms. Beck's witness by telephone. She corroborated Ms. Beck had not left her home in Kalamazoo on the night of July 18, 2008.

37.    On July 21, 2008 Varley personally interviewed Updike's witnesses; defendants' Reed and Dehart. Both confirmed Updike was not at home at the time of the alleged July 18, 2008 stalking incident.

38.    In PPS Complaint Incident Report, hereafter CIR, #08-001996 Varley documented the "Offense Date" as July 21, 2008. and the alleged incident occurred at 18:18 [6:18 pm]; several hours after Varley interviewed Ms. Beck by phone and two days after leaving Ms. Beck two voice

39.    Varley dated and timed all of his interviews with the exception of his interviews and follow-up conversations with Updike, at all times relevant to this Complaint.

40.    During Reed's interview she informed Varley she had received an email a few days earlier which was not flattering to Updike. She alleged she did not know the sender.

41.    During Dehart's interview he informed Varley he had two face-to-face conversations with the alleged stalker. He claimed he asked the suspect if she knew Rick Updike. She said no. He then asked her if she was Rick's ex-wife. The alleged suspect replied, "She didn't know any Rick, she was looking for Julie."

42.    According to CIR #08-001996 Dehart described the alleged stalker as a woman in her mid-to late 40's with short, shoulder-length hair and a thin build at approximately 5'8" and 140 pounds. "David stated she was wearing glasses, he thought they were wire-rimmed,

oval in shape." Dehart's description of the alleged suspect was not a description of Ms. Beck.
Dehart told Varley if he could see a photo of Ms. Beck he would be able to identify her.

43. Ms. Beck looks nothing like the alleged suspect Dehart described that evening; a
description Updike claimed was an 'exact' description of Ms. Beck on July 18, 2008 and
again on July 23, 2008 in his false sworn Petition for an ex-parte PPO, at all times relevant to
this Complaint.

44. Updike and Ms. Beck were married for 20 years. Ms. Beck's stature is
remarkable; she is almost six feet tall in shoes and weighs 123 pounds. Upon first meeting
Ms. Beck strangers often to remark she is tall and skinny.

45. Updike knew Ms. Beck had never worn her hair shoulder length nor did she own
oval, wire-framed glasses. Updike knowingly and willfully lied to the police on July 18,
2008.

46. But for Varley's decision to interview Ms. Beck over the telephone, this case
would have ended on July 21, 2008 immediately following Varley's interview of Dehart.

47. The physical description Dehart provided Varley was actually an exact description
of Sandra Lamorandier, the defendants' human resources manager. Ms. Lamorandier and Ms.
Beck were in the same photo Updike provided Varley on July 25, 2008. Varley used this
photo in his line-up, at all times relevant to this Complaint.

48. On Wednesday, July 23, 2008 several days prior to the close of the investigation,
defendants' Updike and Champion prepared and signed a sworn Affidavit and Petition in
support of Updike's request for an ex-parte Personal Protection Order, PPO, against Ms.
Beck.

49. Updike's sworn Affidavit stated, "On Friday, July 18, 2008 the Respondent was

caught by Petitioner's neighbor at midnight peering into Petitioner's bedroom window."

Updike's statements in his sworn Affidavit and Petition were false. Champion signed them.

50.     On Friday, July 25, 2008 at 7:52 am, Updike sent an email to Varley informing him he'd located a "pretty good picture" of Ms. Beck on the City's 'S' drive.

51.     Varley documented in his first Supplement to CIR # 08-001996, "At approximately 4:00 pm on 7/25/09, David Dehart, a witness in this case, came into the Plainwell Department of Public Safety to look at a photograph of the suspect which was given to me by the complainant [defendant Updike]. The photograph is attached to the report."

52.     "I showed David **the** photograph and asked him if the person looked familiar to him pertaining to this case. He stated he was 70% sure it was her but not positive. He **later** said he was 90% sure it was her," an opinion which at all times remains relevant to this Complaint.

53.     The photo line-up was a one-person photo array consisting of Ms. Beck's photo; the photo Updike provided Varley earlier in the day. Ms. Lamorandier was also in the photo. Varley **was** savvy enough to redact Ms. Lamorandier's face.

54.     A one person line-up does not conform to the United States Department of Justice protocols for eyewitness identification of a suspect using a photo line-up or photo array. Varley's line-up would have been inadmissible.

55.     Varley's atypical police investigation protocols; interviewing the 'sole' suspect via phone and then presenting the alleged eyewitness with a one photo, photo line-up using a photo Updike provided Varley on the day of the line-up created an enormous likelihood Varley's investigation protocols would result in a misidentification.

56.     Following Ms. Beck's discovery of Varley's atypical protocol for his photo array,

she attempted to acquire information regarding Varley's line-up protocol including what, if any, conversation had occurred between Varley and Dehart during this time period. The defendants' denied Ms. Beck access to any information regarding Varley's and Dehart's interactions.

57.     At 3:15 pm on July 28, 2008 Ms. Beck sent an email to defendants requesting an update of the investigation. Citing MCL 750.411a she requested PPS initiate an investigation into Updike's false crime report against her.

58.     Ms. Beck's email was the catalyst for defendants' conspiracy to engage in repeated, intentional, oppressive, malicious, and false allegations against Ms. Beck.

59.     At 4:07 pm, 52 minutes after Ms. Beck sent her email to defendants', Wilson forwarded Ms. Beck's email to his subordinate Updike stating, 'Rick, FYI." Sometime between 4:07 pm and 5:14 pm Wilson directed his subordinate, Bomar, to respond to Ms. Beck's email "as such." Wilson provided Bomar, the director of public safety and chief of police, with the language he wanted Bomar to use in City of Plainwell's response to Ms. Beck's request PPS investigate Updike for committing a misdemeanor.

60.     Wilson not only provided his direct report Updike with Ms. Beck's reasonable request PPS investigate Updike for willfully committing a crime, in December 2008 during a telephone call between Wilson and Ms. Beck, Wilson informed her he did not supervise Bomar.

61.     Per the instructions of Wilson, Bomar replied to Ms. Beck stating Varley was on vacation and unable to contact Ms. Beck until the following week. PPS would keep Ms. Beck abreast of the case upon Varley's return to work. Bomar stated he was not informed of the

investigation details and, as such, could only inform Ms. Beck the investigation was still open and under investigation.

62.     In Varley's August 5, 2008 Supplement to CIR #08-001996, a Supplement written the same day the defendants' received Ms. Beck's first FOIA request, Varley documented he informed Updike sometime during the day of July 28, 2008; the same day defendants received Ms. Beck's first email, that Ms. Beck was no longer a suspect. Updike replied, "He had heard some talking outside his residence between the neighbor and the female and he was not completely sure it was her, either."

63.     Varley, a detective and second in command at PPS, failed to note Updike's material revision to his original July 18, 2008 false allegations. In CIR #08-001996 Varley documented five times Updike was not at home at the time of the alleged stalking incident. Ms. Beck is neither a detective nor a 20 year veteran police officer; however, she immediately noted Updike's revision.

64.     Although Varley had allegedly informed Updike on July 28, 2008 Ms. Beck was not a suspect, at 8:30 pm that evening, defendants obtained the first of seven ex-parte PPO's against Ms. Beck from Judge Curtis J. Bell of the County of Kalamazoo Ninth Circuit Court; Family Division based on the information in the July 23, 2008 false sworn Affidavit and Petition. Plainwell is located in Allegan County.

65.     MCL 600.2950a (24) states, "An individual who knowingly and intentionally makes a false statement to a court in support of his or her petition for a personal protection order is subject to the contempt powers of the court." Upon notice Ms. Beck was not a suspect and the case had been closed defendants' had an obligation to inform the trial court of the error and immediately correct it. They did not.

66.     Defendant Champion works directly with all the parties. He knew or should have

known Varley had informed Updike Ms. Beck was no longer a suspect.

67.     Champion is an office of the court. He is required to abide by the Michigan Rules

of Professional Conduct. He did not.

### MICHIGAN RULES OF PROFESSIONAL CONDUCT
### Rule 1.0 Scope and Applicability

#### Preamble: A Lawyer's Responsibilities
This preamble is part of the comment to Rule 1.0, and provides a general
introduction to the Rules of Professional Conduct. A lawyer is a representative
of clients, an officer of the legal system and a public citizen having special
responsibility for the quality of justice.

"Fraud" or "fraudulent" denotes conduct having a purpose to deceive and not
merely negligent misrepresentation or failure to apprise another of relevant
information

.
"Knowingly," "known," or "knows" denotes actual knowledge of the fact in
question. A person's knowledge may be inferred from circumstances.

"Reasonable belief" or "reasonably believes," when used in reference to a
lawyer, denotes that the lawyer believes the matter in question and that the
circumstances are such that the belief is reasonable.

#### Rule 1.2: SCOPE OF REPRESENTATION
Subsection (c) "A lawyer shall not counsel a client to engage, or assist a
client, in conduct that the lawyer knows is illegal or fraudulent, but a lawyer
may discuss the legal consequences of any proposed course of conduct with a
client and may counsel or assist a client to make a good-faith effort to
determine the validity, scope, meaning, or application of the law.

68.     Champion's failure to correct defendants' false sworn statements in his Affidavit

and Petition for an ex-parte PPO resulted in Ms. Beck being immediately placed on LEIN.

The concealed weapons licensing board was notified of her unlawfully acquired ex-parte

PPO. Ms. Beck's PPO forbade her from possessing a firearm.

69.     At 9:49 pm on July 28, 2008 Ms. Beck sent a second email to defendants

indicating she discovered Champion, who had represented Updike in the parties divorce, was

defendants' city attorney. Ms. Beck was not aware of Champion's employment contract with defendants until July 28, 2008.

70.     Ms. Beck's email suggested it would be prudent for defendants to request a neutral, third-party law enforcement agency investigate Updike's false allegations against Ms. Beck to avoid any appearance of bias. This never happened.

71.     On July 29, 2008 at 4:36 pm, Bomar replied to Ms. Beck's email, providing her with the telephone number for the Michigan State Police, Wayland Post. She was unable to contact anyone that evening; the administrators and detectives leave the post at 4:30 pm.

72.     On July 30, 2008 at 11:00 am, Varley contacted Ms. Beck by phone and told her she was no longer a suspect. Varley informed Ms. Beck he could not charge her with stalking; the witness, Dehart was only 90% certain she was the stalker. According to Varley, Dehart had to be 100% certain Ms. Beck was the stalker before he could charge Ms. Beck with a crime.

73.     Ms. Beck stated, "I could provide you with names of other women who might have a beef with Updike. I'm sure I'm not the only woman who he failed to inform he has Genital Herpes." Varley replied angrily, "I don't want to hear your crap."

74.     Ms. Beck was perplexed; on July 28, 2008 Bomar informed Ms. Beck that Varley was on vacation and would not be returning until the following week.

75.     Ms. Beck needed clarification so she called Varley back approximately 20 minutes later. She was informed Varley was not in, he was on vacation. She stated she had just talked with him. The officer replied, "Oh, he just stopped in to clean something up."

76.     Defendants refused Ms beck's requests to investigate her allegations defendants tried to set her up in an effort to have her charged with a crime. PPS initially refused to

release the investigation to the Michigan State Police. When defendants finally agreed to release the investigation to MSP, they included two additional false reports alleging Ms. Beck had been caught stalking Updike's home after his initial July 18, 2008 false allegation didn't result in her arrest.

77. Ms. Beck was not notified of these charges nor was she ever questioned. The Allegan County Prosecutors Office denied both of PPS's requests to charge Ms. Beck with stalking.

78. In January 2009 MSP Det/F/Lt Curtis Schram informed Ms. Beck of defendants' two additional attempts to seek charges against her for stalking. As such he refused to reopen the original case.

79. Ms. Beck had not been in Plainwell on July 18, 2008; a fact confirmed by her witness. Dehart had never met Ms. Beck; a fact confirmed by his grossly inaccurate description of her. Varley chose to employ atypical police investigation protocols; a fact confirmed by his impermissably suggestive photo array.

80. Updike, Dehart and Reed colluded to engage in lawful conduct for unlawful purposes; falsely charging Ms. Beck with a crime. Because the parties colluded to engage in the unlawful conduct, the crime was no longer a misdemeanor, it was a felony; MCL 750.175a and 750.411a.

81. Defendants refused Ms. Beck's request they investigate Updike and his neighbors for engaging in lawful conduct for an unlawful purpose.

82. On August 12, 2008 during a meeting Ms. Beck requested with Bomar and Varley she was provided PPS-CIR #2008-001996. During the meeting Varley 'officially' closed the case.

83.     After a careful and thorough review of PPS-CIR # 08-001996, Ms. Beck noted
CIR #08-001996 contained numerous material errors and inconsistencies.  The report also
proved Updike didn't act alone on July 18, 2008 when he filed his first false allegation;
Dehart and Reed colluded with Updike in filing the July 18 false crime report.

84.     Around 8:00 pm that night, Ms. Beck called Dehart and politely asked him to
describe her.  He became very angry and began verbally abusing Ms. Beck.  Dehart called her
a "fucking cunt."  Remaining calm, Ms. Beck asked Dehart a second time to please describe
her.  He became more enraged and told her she was a "fucking crazy bitch."  He finally hung
up.

85.     The following morning, Varley contacted Ms. Beck and asked if she'd called
Dehart.  Ms. Beck said, "Yes, I asked him to describe me."  Varley informed Ms. Beck it was
unlawful for her to contact a witness; a 'witness' to what?  Ms. Beck did not stalk Updike's
home was not charged and the case closed.

86.     Varley asked Ms. Beck if she threatened Dehart.  Ms. Beck replied she told Dehart
she was going to go to the Michigan State Police about the false allegations.  Varley warned
Ms. Beck if she contacted any other party involved in Updike's false crime report he would
charge Ms. Beck with a crime.

87.     After being threatened by Varley, Ms. Beck sent more FOIA requests to Wilson,
the City of Plainwell's FOIA officer.  She requested public records she believed would
support her assertions defendants conspired to deny Ms. Beck her federally protected rights
while actively engaging in a cover-up of Updike's felony and PPS's questionable
investigation protocols.

88.     Wilson requested several thousand dollars from Ms. Beck before Wilson would

release the public records. As such Ms. Beck received very few.

89.    Ms. Beck began her own investigation into the alleged July 18, 2008 stalking incident. Using satellite imagery Ms. Beck noted Dehart's assertions in CIR #08-001996 were logistically improbable and more likely impossible.

90.    On August 20, 2000 Ms. Beck's attorney called her and informed her he'd received an ex-parte PPO Updike had been granted at 8:30 pm on July 28, 2008; the same day Varley documented in the Supplement to CIR #08-001996 that he'd informed Updike Ms. Beck was no longer a suspect. Updike stated he didn't think it was her, either. Mr. McCune requested she stop by to pick up the documents.

91.    That afternoon Ms. Beck stopped at her attorney's office. While there they compared the information in CIR #08-001996, with the statements in Updike's sworn Affidavit and Petition.    Noting the overt discrepancies between the documents and after discussing Ms. Beck's assertions based on the satellite images of the area, her attorney suggested she go to Plainwell and take photos to support her theory.

92.    At 2:15 pm that afternoon, Ms. Beck drove to Plainwell, stood in the public street in front of Dehart's house and made a video of the area. Ms. Beck's video proved Dehart's statements were false. While taping, a person came out of Dehart's house and asked Ms. Beck what she was doing? She replied, "I'm making a video for my attorney."

93.    That afternoon Updike filed two complaints with PPS; the first at 2:26 pm, (CIR #08-002228) the exact time Ms. Beck was in Plainwell and the second at 3:36:14. (CIR #08-002229) Ms. Beck's friend FOIA'd CIR #08-002229 in February 2009. Ms. Beck was not aware of CIR #08-002228 until she received the Report from Allegan County in November 2009.

94.     Along with her video, Ms. Beck was able to acquire a few additional records and information which supported her belief Wilson, Bomar Champion and Varley acted under color of state law; colluding to cover up Updike's misconduct while conspiring to deny Ms. Beck's federally protected rights.

95.     In late August or early September 2008 Ms. Beck spoke to MSP Captain David Greydanus at the MSP Wayland Post. She asked him to investigate Updike's false allegations Captain Greydanus informed her PPS would have to request the MSP to take over the case.

96.     Ms. Beck contacted the Allegan County Prosecutors office several times, as well. Her calls were not returned.  Finally, in mid-late September Ms. Beck connected with Det/F/Lt Curtis Schram of the MSP 6th District Headquarters in Grand Rapids.

97.     After Ms. Beck shared the facts of the case, Det/F/Lt. Schram agreed to contact Bomar to discuss her request. In early October Detective Schram informed Ms. Beck Bomar would not release the investigation to MSP.

98.     After talking with Det/F/Lt Schram, Ms. Beck was viewing Plainwell's website and discovered an Island City E-Ticket Request Reed sent to PPS on September 30, 2008 at 2:40 pm. Reed requested PPS replace a streetlight which had been damaged in a traffic accident. Her request stated the 500 block of S. Main Street was so dark she had to keep her porch light on in the evening to provide light for walkers and runners and for security reasons.

99.     Reed's concerns about the lack of lighting in the 500 block of S Main Street did not support Dehart's statements in CIR #08-001996. Two months earlier Dehart claimed he was able to see a person walking though the backyards of homes in the 500 block of S Main Street at 11:15 pm. He asserted he was able to watch the alleged stalker walking between Reed's and Updike's home, heading east; a distance of over 75 feet from his location.

100.    Ms. Beck contacted Hillary Hogarth at Consumers Energy and asked if she knew when this accident occurred.  After researching the issue, Ms. Hogarth contacted Ms. Beck to inform her that the accident referenced in Reed's request occurred on June 7, 2002; more than six years prior to Reed's September 30, 2008 request.

101.    After speaking with Ms. Hogarth, Ms. Beck contacted Det/F/Lt Schram and asked when he contacted Bomar.  Det/F/Lt Schram confirmed he called Bomar at 9:00 am on September 30, 2008; a bit less than five hours before Reed filed her request with PPS.

102.    At 4:35 pm on October 16, 2008 Ms. Beck went to PPS and spoke to Bomar. She requested the UD-10 accident report from June 7, 2002.  The following morning Ms. Beck received an email from Bomar indicating the report was available.

103.    Bomar's email stated Ms. Beck was not allowed to appear at PPS; it was a violation of Updike's unlawfully acquired ex-parte PPO. Ms. Beck was instructed to send PPS a self-addressed, stamped envelope and PPS would mail the Report to her. As such she would not have received the report in time for her October 20, 2008 hearing.

104.    Bomar's email threatened Ms. Beck with arrest and incarceration if she appeared in person to acquire the document.  Bomar followed up the email with a certified letter stating the same.  Updike's office is located more than one mile from PPS.

105.    In January 2009 Ms. Beck learned from Det/F/Lt Schram on October 26, 2008 Reed filed compliant with PPS accusing Ms. Beck of stalking Updike's home.  On her return to Kalamazoo, after dropping off her request for the UD-10 Report with Bomar she drove down S. Main Street; the normal route to Kalamazoo from downtown Plainwell.  Updike's home is located on S. Main Street.  PPS requested the Allegan County Prosecutor charge Ms. Beck with stalking.  PPS's request was denied.

106.    During the Ms. Beck's October 20, 2008 Motion hearing requesting the Court

rescind her unlawfully acquired ex-parte PPO, Champion intentionally provided false

argument to the court.

107.    Champion argued Ms. Beck was caught stalking Updike's home on July 21, 2008

while Mr. Updike was in bed sleeping. He further argued Updike's neighbor caught Ms. Beck

around midnight and woke Updike from his sleep to inform him of this alleged incident.

108.    Champion's false argument was the second material revision to Updike's July 18,

2008 false crime report. Additionally, his argument was in complete contradiction to

defendants' sworn statements in the July 23, 2008 Affidavit and Petition he signed as well as

all the information documented in PPS CIR #08-001996; a Report attached to Ms. Beck's

verified pleadings. The court was in possession of all these documents.

109.    Regardless of the facts, on October 20, 2008 the court refused to rescind Ms.

Beck's PPO citing as its reason PPS's impermissably suggestive photo line-up;

> THE COURT: "Counsel it doesn't say that he didn't think it was her, Seventy-
> nine—70 to 90 percent that's certainly beyond preponderance, and some
> would argue clear and convincing evidence, so—I mean—and the 90%
> some say that's reasonable doubt. Just because you didn't get caught,
> doesn't mean you didn't commit the crime."

110.    The Court did grant Ms. Beck the right to have contact with defendant City of

Plainwell and Plainwell Public Safety to "work on her case."

111.    In early January 2009 sometime between noon and 1:00 pm, Ms. Beck had a

conversation with former Kalamazoo Public Safety Director Dan Westin. She asked Mr.

Westin if it was lawful for PPS to ban her from appearing at PPS. He told her it was not.

112.    Following her conversation with Mr. Westin, Ms. Beck sent an email to Wilson

informing him that "during lunch I spoke to Mr. Westin. He stated it is unlawful to deny a

person access to a police department."

113. In January 2009 Ms. Beck filed a complaint of gender discrimination against Plainwell Public Safety with the Michigan Department of Civil Rights, MDCR for their refusal to investigate a woman's valid complaints, while repeatedly acquiescing to a male's requests to investigate false allegations.

114. On January 31, 2009 while Ms. Beck was not restrained, she contacted Plainwell city councilwoman, Lori Steele to complain about Updike's false crime reports and Plainwell Public Safety's investigation, or lack thereof. Ms. Steele informed Ms. Beck, "Plainwell didn't investigate Updike's complaints; the Allegan County Sheriff's Department did." Defendants knowingly and willfully lied to the Plainwell City Council.

115. Following Ms. Steele's conversation with Ms. Beck, Ms. Steele notified defendants of the conversation. Defendants prepared a second false sworn Petition requesting another ex-parte PPO against Ms. Beck.

116. On February 13, 2009 the Court granted Updike's request Ms. Beck be restrained without a hearing for an additional six months. The court restrained Ms. Beck for contacting an elected official in an attempt to redress her grievances with defendants. [3]

117. Temporal proximity between the protected conduct and the adverse action by the state actor "alone may be significant enough to constitute indirect evidence to create an inference of retaliatory motive." [4]

118. Prior to Ms. Beck's March 2, 2009 Motion hearing requesting the court rescind her second unlawfully acquired ex-parte PPO, defendants provided Champion with Ms. Beck's Private Health Information, PHI.

---

[3] *Bloch v Ribar*, 156 F.3d 673, 678 (6th Cir. 1998)

[4] *Muhammad v Close*,379 F.3d 413, 417-18 (6thCir. 2004)

119. Defendants violated Ms. Beck's privacy rights under the Health Insurance Portability and Accountability Act of 1996, HIPAA. Champion is not a designated HIPAA Privacy Officer for defendant City of Plainwell. He was not entitled access to Ms. Beck's PHI.

120. Ms. Beck filed a civil rights complaint with the US Department of Health and Human Services complaining defendants' violated her PHI under HIPAA. Defendant City of Plainwell is a Covered Entity as defined under HIPAA. Defendants knowingly and intentionally lied to the investigator from USDHHS Department of Civil Rights.

121. During the March 2, 2009 hearing, Champion placed on record he was made aware of Ms. Beck's MDCR complaint. He falsely argued the Michigan State Police investigated Ms. Beck's complaints against defendants and found no wrong doing. This was not fact. Det/F/Lt Schram sent an email to Ms. Beck and Wilson stating the MSP would not re-investigate Updike's false report.

122. Champion argued Ms. Beck informed Wilson she had lunch with Mr. Westin. He stated someone from the Allegan County Sheriff's Department contacted Mr. Westin and asked him if he had lunch with Ms. Beck. He said, "No, she made me a sandwich." Champion stated, "And these are the kinds of lies she tells."

123. The email Ms. Beck sent to Wilson stated Ms. Beck spoke to Mr. Westin during the lunch hour. While they conversed Ms. Beck made Mr. Westin a sandwich. Ms. Beck's email regarding Mr. Westins remarks and Det/F/Lt Schram's email to Wilson had absolutely nothing to do with Updike's alleged post-divorce, private cause of action, yet Wilson was providing his subordinate, Champion with all of Ms. Beck's communications.

124. Ms. Beck's communications with defendants' were made in an attempt to redress

her grievances with Wilson, PPS, Bomar, Varley, Champion and the elected officials of Plainwell.

125.    Champion falsely argued Ms. Beck was appearing at Plainwell City Hall on an almost daily basis. Ms. Beck had not returned to Plainwell for any reason after requesting the 2002 accident report on October 16, 2008. He falsely alleged Ms. Beck had taken joint marital property to Updike's apartment and covered it in dog feces. This is not fact, a point easily proven by reading Champion's documents from the divorce proceedings.

126.    Champion implied Ms. Beck was secretly recording Mr. Updike. This is not fact. He expressed surprise Ms. Beck knew Mr. Updike was living in Plainwell. This is fact. PPS and Updike provided this information in CIR# 08-001996; the report wherein Updike alleged Ms. Beck was caught stalking his home in Plainwell.

127.    Champion's arguments confirmed defendants had apprised him of every communication between Ms. Beck and the defendants; communications wholly unrelated to the defendants assertions they were engaged in a legitimate post-divorce, private cause of action. Champion stated and or implied or both Ms. Beck was conducting a clandestine operation hoping to get Updike fired.

128.    Ms. Beck was never reticent in expressing her discontent with the officers of Plainwell for their refusals to investigate Updike, Dehart and Reed for knowingly and maliciously committing felonies, nor was she implementing a quasi-clandestine plot to get Updike fired as Champion repeatedly insinuated to the court.

129.    Ms. Beck wanted a highly intelligent, intuitive, experienced and ethical detective to investigate defendants' misconduct and if necessary charge the parties for their unlawful conduct and prosecute them accordingly. She wanted justice.

130.    Defendants willfully engaged in fraud upon the court preventing the court from

acting in his normal impartial manner.  Defendants' intentionally presented false arguments

and testimony to ensure the court would deprive Ms. Beck her right to due process and equal

protection. .

131.    Demonstrating extreme bias and in defiance of the facts, the court, in his denial of

Ms. Beck's second request to rescind Updike's February 13, 2009 unlawfully acquired ex-

parte PPO opined:

> THE COURT: "The Respondent makes argument that Mr. Updike is dishonest in
> securing his PPO's. She holds it out *the fact that although she was investigated she*
> *was never charged.* And quite simply there—there are a number of crimes that are
> investigated in which people are investigated, whether or not they've done it or not,
> and they could have done it and they could not have and—and the evidence simply
> was not sufficient to move forward.  I don't know what the police—what their
> conclusion was--- ---all I know is that they didn't charge you.  Does that mean you
> weren't there, NO. Does it mean you were there, NO.  It means—it means neither to
> me.

> THE COURT: "Did you have the right to exercise your rights?  Sure, lots of people
> do.  But did you go over the top?  In my opinion, you did. By your own admission,
> *going to the State Police and the Attorney General about a complaint your ex-husband*
> *had every right to make; he thought it was you.  Whether or not it was you is still up*
> *for debate, I guess."*  (OT 3-2-2009) [5] ( Emphasis added)

132.    The court's justification for his second refusal to rescind Ms. Beck's PPO was

indicative he was an active participant in defendants' conspiracy; blatantly ignoring the facts

and willfully denying Ms. Beck's federal rights.

133.    Following the March 2, 2009 PPO hearing, Wilson ordered Plainwell employees

to investigate if the false information Champion presented to the court had any basis in fact.

It did not.

134.    On March 17, 2009 Ms. Beck relocated to Manitowoc, Wisconsin; 340 miles from

Kalamazoo Michigan.  Subsequently, defendants unlawfully acquired five extensions to Ms.

---

[5] *People v Hudson*, 241 Mich App 268,276:615 NW2d 784 (2000)

Beck's February 13, 2009 PPO.

135. On August 4, 2009 defendants' filed a petition for an extension to the February 13, 2009 PPO immediately after Ms. Beck sent PPS an Island City E-Ticket Request in late July asking them to "please ask your superintendent of public works to remove my personal home phone number from his information on the USA Cycling web site."

136. On August 14, 2009 the court granted the extension of Ms. Beck's PPO and set a Show Cause hearing date for September 21, 2009 to address her innocuous request of PPS. Updike alleged in his Petition for an ex-parte extension Ms. Beck's request cause him to be fearful for his life.

137. On August 28, 2009 Ms. Beck sent an email to the late Pam Aukerman Brainard's minister, Pastor Minegar of Otsego. Her email was related to Pam's murder in 2007 by her PPS officer husband. On September 2, 2009 Champion sent Ms. Beck's counsel, Michael Villar, a Proof of Service notifying Mr. Villar of the extension of his client's PPO and the September 21, 2009 Motion hearing requesting the court further extend Ms. Beck's unlawfully acquired PPO. Mr. Villar received the letter on September 14, 2009.

138. Champion falsely alleged in his letter Ms. Beck had engaged in contact with Updike in violation of the August 14, 2009 extension of her PPO; a PPO of which neither Ms. Beck nor her attorney had knowledge until September 14, 2009.

139. Champion enclosed as proof of Ms. Beck's alleged unlawful contact with Updike a severely altered copy of Ms. Beck's August 28, 2009 email to Pastor Minegar. Champion stated the email Ms. Beck sent to Pastor Minegar was actually sent to Updike. This was not fact.

140. Defendants twice argued Pastor Minegar was an employee of the City of

Plainwell. Pastor Minegar was neither an employee nor an independent contractor of the City of Plainwell at any time during this case.

141.    Ms. Beck's father was dying and in hospice care. Defendants agreed to postpone a September 14, 2009 hearing because of Ms. Beck's father's condition. Defendants refused to reschedule a September 21, 2009 hearing stating they did not believe Kenneth Beck's medical condition was deteriorating. It couldn't. Kenneth W. Beck lived five days too long to suit the defendants; he passed away on September 26, 2009 after battling prostate cancer.

142.    Mr. Villar had an already scheduled hearing in Ottawa County for September 21, 2009 9:30 am; the same date and time of Ms. Beck's hearing in Kalamazoo County. He was unable to reschedule the hearing in Ottawa County. Mr. Villar attempted to be present for the September 21, 2009 hearing. in Kalamazoo. However, the court, knowing he was on his way to Kalamazoo following the hearing in Ottawa County refused to wait for him. Subsequently, the court extended Ms. Beck's February 13, 2009 PPO through December 2009.

143.    In November 2009 Ms. Beck received public records she had FOIA'd from Allegan County relevant to her complaints against the defendants. Allegan County charged her $5.00 for the records.

144.    After reviewing the Allegan County records, Ms. Beck noted PPS altered and modified closed police reports and created false police reports relative to Updike's, Dehart's and Reed's false allegations. In late November and early December 2009 Ms. Beck sent defendants' several new FOIA requests.

145.    On December 11, 2009 Wilson responded to Ms. Beck's FOIA requests. The cost to reproduce the public records defendants' were willing to provide Ms. Beck was over $40,500.00. Wilson was willing to provide Ms. Beck with the public records relevant to his

unlawful disclosure of Ms. Beck's PHI under HIPAA; the defendants' charges for these records, a mere $12,180.23.

146. Defendants' denied Ms. Beck a copy of CIR #08-001996; the closed police report of Updike's original false allegations. Defendant's alleged releasing this report would impede their investigative abilities. PPS altered the closed Report on February 24, 2009 at 12:02:34 am, no Supplement was added.

147. On December 13, 2009 defendants were granted another extension to Ms. Beck's PPO alleging she violated the terms of her prior restraint by requesting public records from defendants.

148. On February 18, 2010 Ms. Beck contacted Plainwell city councilwoman Lori Steele and asked Ms. Steele who, in 2009, told her the Allegan County Sheriff investigated Updike's false crime reports. She informed Ms. Beck Bomar had provided this false information to the Council.

149. Ms. Steele immediately informed the defendants of her conversation with Ms. Beck. On February 23, 2010 the court granted defendants another extension to Ms. Beck's PPO. Defendants requested the court incarcerate Ms. Beck until her show cause motion hearing on March 12, 2010. The court did not agree to defendants' request.

150. The information Ms. Steele shared with Ms. Beck during the February 18, 2010 phone conversation confirmed Ms. Beck's contention defendants', while acting in their official capacities, willfully, knowingly and maliciously engaged and continued to engage in a conspiracy to deprive Ms. Beck of her rights with the intent of silencing her and causing her to suffer great harm.

151. On March 12, 2010 the Court asked Ms. Beck if she sent the defendants FOIA

requests.  She said "Yes."  As a result, Ms. Beck was charged with criminal contempt of court for violating the terms of her 4th and 5th extensions to her February 13, 2009 ex-parte PPO.

152.  The Court opined Ms. Beck's decision was a violation of her prior restraint, sentenced Ms. Beck to a 90 day jail term and fined her thousands of dollars in defendants' attorney fees.  Prior to sentencing Ms. Beck the court opined:

> THE COURT: "I believe the Ms. Beck should have been charged with stalking and criminally prosecuted.  I believe law enforcement was delicate with her because she's been through a divorce and apparently has some other issues."[6], [7]

153.  Ms. Beck never committed a crime, was never charged with a crime and the cases closed.

## COUNT I
## FIRST AMENDMENT RETALIATION

154.  Ms. Beck restates and realleges as though fully set forth herein paragraphs 1-153 of this Complaint.

155.  This case lies, as is obvious at the core of a First Amendment concern, namely the interest in "…to apply to the Government for a redress of grievances, shall not be infringed."[8]

156.  Ms. Beck had a clearly established right under the First Amendment of the Constitution of the United States not to be retaliated against for requesting public records and speaking out to the officers and officials of a government body about matters of public interest and for petitioning a unit of government for a redress of grievances including speaking out about the performance of the administrators and employees of the public body.

157.  The defendants employed concerted, malicious, intentional and retaliatory actions

---

[6] *People v Justice (After Remand)*, 454 Mich 334, 334:562 NW2d 652 (1997) Probable Cause requires a quantum of evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief in the accused's guilt."
[7] *People v King*, 412 Mich, 154;312 NW2d 629 (1981). The district court is to examine and make a decision on the entire record.
[8] Records of the United States Senate, IA-C2 (U.S. Nat. Archives)

against Ms. Beck for exercising and continuing to exercise her First Amendment Rights.

158.     Defendants successfully silenced Ms. Beck by having her incarcerated and destroying her financially through their ongoing intentional, malicious and unlawful allegations and threats. The defendants conduct was made possible only because the wrongdoers were clothed with the authority of state law.

159.     Throughout the time period at issue in this Complaint, defendants employed a policy and a pattern and/or practice of retaliatory conduct against Ms. Beck for expressing criticism of defendants' conduct to third party law enforcement agencies, the judiciary, local, state and federal elected officials or any combination of the above.

160.     As a result of defendants' concerted, unlawful and malicious conduct, Ms. Beck was deprived of her First Amendment rights. Defendants' violations of Ms. Beck's First Amendment rights described above are actionable under 42 USC §1983.

## COUNT II
## CONSPIRACY TO DENY MS. BECK'S FIFTH AND FOURTEENTH AMENDMENT RIGHTS

161.     Ms. Beck restates and realleges as though fully set forth herein paragraphs 1-160 of this Complaint.

162.     Ms. Beck had a clearly established right to due process and equal protection of the laws under Article I, Sec. 17 of the Michigan Constitution and the fifth, and fourteenth amendment of the United States Constitution.

163.     The defendants conspired to ensure Ms. Beck's rights, privileges and immunities were denied and the due course of justice impeded in violation of the fifth, and fourteenth amendments of the Constitution of the United States.

164.     Defendants attempted to conceal their respective roles in executing the unlawful,

intentional and malicious deprivation of Ms. Beck's rights falsely alleging this case was a post-divorce, private cause of action.

165. The fact defendants and elected officials of Plainwell were willingly providing Updike and Champion with information unrelated to the alleged post-divorce, private cause of action demonstrated defendants were, at all times, engaging in a conspiracy.

166. Defendant Wilson knowingly authorized and participated in denying Ms. Beck her rights by instructing his subordinates as to the content and context of their responses to Ms. Beck as well as instructing his subordinates as to how to respond to City of Plainwell's elected officials' inquiries into Ms. Beck's valid complaints.

167. Wilson had actual knowledge his actions and those of his subordinates violated Ms. Beck's rights and created a serious risk of injury to Ms. Beck, yet he continued to participate and/or acquiesce or both in perpetuating the violations.

168. Bomar had actual knowledge his subordinate Varley intentionally employed a pattern and practice of atypical police investigation protocols resulting in a high probability Ms. Beck would be falsely accused of a committing a crime and causing her to suffer injuries.

169. As the City of Plainwell FOIA Officer, Wilson repeatedly and intentionally demanded outrageous fees from Ms. Beck for public records, effectively denying Ms. Beck the requisite information which would support her assertions defendants' were engaged in a conspiracy to willfully and maliciously deny Ms. Beck her federal rights.

170. Wilson's knowledge of his subordinates' unlawful activities was an implicit approval of their conduct. Wilson was in the conductor's role directing his subordinates as to how to manage the situation in the best interests of defendant City of Plainwell, regardless of the high probability defendants' conduct would inflict serious injuries upon Ms. Beck.

171. When Wilson began providing his subordinates with Ms. Beck's emails, informing them of the content and context of his conversations with Ms. Beck, sharing information regarding Ms. Beck's complaints against the officers of Plainwell, Wilson stopped conducting the conspiracy and became a co-conspirator, instrumental in creating a cover-up for the crimes he and his subordinates were committing.

172. Following Ms. Beck's March 2, 2009 PPO hearing, Wilson, in an effort to protect defendants' Champion and Updike from suffering legal consequences for their misconduct in court, directed employees of defendant City of Plainwell to research information related to Champion's false allegations against Ms. Beck. Their research confirmed Champion willfully and maliciously lied to the court causing severe injury to Ms. Beck.

173. Regardless of defendants' Champion and Updike's repeated attestations this was a post-divorce, private cause of action, it was obvious the City of Plainwell by and through its officers and officials became an active participant in conspiring against Ms, Beck, ultimately leading to her incarceration in the County of Kalamazoo Jail and being sanctioned by the court with severe financial penalties, including unlawful modifications to her divorce judgment, and defendants' attorney fees; financial sanctions exceeding $60,000.00.

174. Defendants' actions were conspiratorial; actions employed for the sole purpose of depriving Ms. Beck of her equal protection of the laws and her equal privileges and immunities under the laws and to cover up the misconduct of defendants.

175. The conspiratorial acts of defendants caused Ms. Beck to suffer severe and irrespirable injuries, unlawfully deprived her of property, repeatedly and willfully denied Ms. Beck her rights, privileges and immunities afforded a citizen of the United States and caused her to suffer severe psychological inquires including but not limited to Post Traumatic Stress

Disorder, PTSD.

176.    42 U.S.C. §1985(3) unequivocally states, "When two or more persons conspire for the purpose of depriving any person of the equal protection of the law, they may be sued by the injured party.

177.    At all times relevant herein, the defendants conduct was subject to 42 U.S.C. §1985(3).

## PRAYER FOR RELIEF

WHEREFORE, as a result of defendants' violations as set forth above, Ms. Beck

requests the following relief jointly and severally against all defendants:

A.    Compensatory damages;

B.    Punitive damages;

C.    Enhanced compensatory damages;

D.    The convening and impaneling of a jury to consider the merits of the claims herein;

E.    Costs and interest and attorney's fees, if at any future time applicable,  and

F     Such other and further relief as this Court may deem appropriate and equitable, including injunctive and declaratory relief as may be required in the interests of justice.

DATED: July 12, 2011 RESPONSE: BARBARA L. BECK

By _____
Barbara L. Beck, in Pro Se